UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

MONTANA ENVIRONMENTAL
INFORMATION CENTER
107 West Lawrence
Helena, MT  59624
(406) 443-2520                                        Civil No. _____

CITIZENS FOR CLEAN ENERGY
289 Boston Coulee Road
Great Falls, MT 59405
(406) 736-5791

SIERRA CLUB
85 Second Street, 2nd Floor
San Francisco, CA 94105
(415) 977-5500

                    Plaintiffs,

v.

MIKE JOHANNS
Secretary, U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

JAMES ANDREW
Administrator, Rural Utilities Service
1400 Independence Ave, SW
Washington, DC 20250

RICHARD FRISTIK,
Senior Environmental Protection Specialist,
Rural Utilities Service
1400 Independence Ave, SW
Washington, DC 20250

                    Defendants.

———————————————————————

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case challenges large-scale federal investment in new coal-fired power plants that will substantially increase emissions of greenhouse gases responsible for global warming. The Supreme Court has affirmed that "[t]he harms associated with climate change are serious and well recognized," Massachusetts v. EPA, --- U.S. ---, 127 S.Ct. 1438, 1455 (2007). Congress is working to pass sweeping legislation to cut greenhouse gas emissions and promote reliance on renewable energy, and the President's proposed 2008 budget expressly seeks to divert energy subsidies away from new coal-fired power plants. Nevertheless, the Rural Utilities Service ("RUS"), an arm of the U.S. Department of Agriculture, is preparing to lend billions of federal dollars to build several new coal plants that will accelerate climate change and eliminate the market for cleanly generated electricity.

2.      Most recently, RUS has elected to "participate in funding" the Highwood Generating Station near Great Falls, Montana. The plant will emit an estimated 2.8 million tons of greenhouse gases every year. In addition, RUS is in the midst of the funding process for at least seven other larger coal plants — a 600-MW plant in Missouri, a 385-MW plant in Wyoming, a 400-MW plant in Idaho, a 750-MW plant in Florida, a 750-MW coal plant in Oklahoma, and two 278-MW coal plants in Kentucky — each of which will emit even greater quantities of greenhouse gases than the recently approved Highwood coal plant.

3.      Not only will these plants increase the United States' contribution to global warming for decades to come, they will do significant environmental damage regionally and locally. The Highwood coal plant is illustrative: it will severely degrade air quality and likely contaminate a major aquifer in north central Montana, and it will destroy a National Historic Landmark. Nevertheless, RUS has decided to fund the project without fully disclosing, much

less addressing, its environmental impacts, and without considering viable alternatives to avoid

environmental harm. This failure violates both the National Environmental Policy Act ("NEPA")

and the National Historic Preservation Act ("NHPA"). With this lawsuit, Plaintiffs seek to

enjoin RUS from approving federal loan funds until the agency confronts the global warming

impacts and other environmental consequences of financing new coal plants.

## JURISDICTION AND VENUE

4.      This action arises under the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321, et. seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 407 et

seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§

2201-2202.

6.      Venue lies in the District of Columbia pursuant to 28 U.S.C.

§ 1391(e) because a substantial part of the events or omissions giving rise to this case occurred in

this District, and because federal defendants Andrew, Johanns, and Fristik reside in this District.

## PARTIES

7.      Plaintiff Montana Environmental Information Center ("MEIC") is a member-

supported advocacy and public education organization that works to protect and restore

Montana's natural environment.  Since its founding in 1973, MEIC has lobbied and litigated both

at the state and federal level to prevent degradation of air quality and natural resources.  Recent

MEIC advocacy efforts have focused on reducing pollutant emissions from coal-fired power

plants nationwide.  In this regard, MEIC has participated in a successful federal lawsuit to

compel the U.S. Environmental Protection Agency ("EPA") to withdraw national policy

guidance that had discouraged state permitting agencies from considering the use of integrated

gasification and combined cycle ("IGCC") combustion technology to reduce carbon dioxide and other pollutant emissions from coal-fired power plants.

8.      With respect to the Highwood coal plant specifically, MEIC has led efforts to inform the public, elected officials, and responsible agencies about less polluting alternatives to building an old-technology coal-fired power plant.  At every opportunity in the environmental review and permitting process, MEIC has submitted comments aimed at promoting renewable energy sources, efficiency, and conservation, and thereby reducing emissions that threaten public health and contribute to global warming.

9.      Citizens for Clean Energy ("CCE") is a public interest, non-profit organization dedicated to promoting clean, efficient, cost-effective energy alternatives to coal-fired power. Over the past year, CCE has led a public education campaign to inform Montana citizens and their elected officials about less-polluting alternatives to building a CFB coal-fired power plant in Great Falls.  To this end, CCE has organized lectures and screenings to raise public awareness about global warming; CCE has sponsored several expert presentations on clean energy alternatives to electricity generated by coal-fired power plants; CCE has held a series of informational meetings specifically about the Highwood coal plant across nortern Montana in Great Falls, Havre, Fort Benton, and on the Rocky Boy Reservation; and CCE has presented testimony and submitted extensive comments regarding the plant's adverse impacts on public health, local agriculture, and the Great Falls National Historic Landmark.

10.     Plaintiff Sierra Club is a nationwide conservation organization with more than 750,000 members.  The Sierra Club is America's oldest, largest and most influential grassroots environmental organization.  The mission of the Sierra Club is:  "To explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems

and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments."  To this end, Sierra Club is engaged in a nationwide campaign to champion clean energy in the face of an unprecedented rush to build new coal-fired power plants.  Sierra Club is currently litigating to stop construction of new coal plants across the country; Sierra Club is leading advocacy efforts to pass legislation to curb greenhouse gas emissions, and Sierra Club is collaborating with state and local governments to promote energy efficiency, conservation, and increased reliance on renewable energy.

11.     MEIC, CCE, and Sierra Club members live and work in Montana communities, including Great Falls, Fort Benton and the Rocky Boy Reservation, that will be adversely impacted by pollution from the coal plant.  They include senior citizens, people with asthma, pregnant women, and other individuals who are especially vulnerable to harm from exposure to very fine particulate matter ($PM_{2.5}$), ground-level ozone, mercury, and other harmful pollutants. MEIC and CCE members also include landowners that live and farm in the immediate vicinity of the proposed Highwood coal plant, and many more farmers and ranchers that are severely impacted by drought associated with global warming and climate change.  Federal defendants' decision to fund the Highwood coal plant injures the interests of MEIC, CCE, Sierra Club and their members in breathing clean air, drinking clean water, and curbing greenhouse gas emissions that cause global warming.

12.     MEIC, CCE, and Sierra Club members also include Montana residents who take an active interest in visiting, researching, and preserving the Great Falls Portage National Historic Landmark and the larger Lewis and Clark Historic Trail.  Federal defendants' decision to fund a project that will destroy the Landmark and substantially diminish the overall integrity

of the Historic Trail injures the aesthetic, educational, and cultural interests of these MEIC and CCE members.

13.    Defendant Mike Johanns is the U.S. Secretary of Agriculture and in that capacity has final responsibility for actions taken by RUS. Mr. Johanns is sued in his official capacity.

14.    Defendant James Andrew is the Administrator of the RUS and in that capacity has management responsibility for the actions of RUS, including the agency's compliance with NEPA and the NHPA. In this regard, Mr. Andrew has been in direct correspondence with the Executive Director of the Advisory Council of Historic Preservation regarding adverse impacts to the Great Falls Portage National Historic Landmark, where the Highwood coal plant would be sited. Mr. Andrew is sued in his official capacity.

15.    Defendant Richard Fristik is the Senior Environmental Specialist at RUS and in that capacity has supervisory authority over RUS compliance with NEPA and the NHPA. Mr. Fristik has actively overseen both the NEPA and NHPA process for the Highwood coal plant, and has served as the lead RUS contact for consulting agencies and organizations and the public. Mr. Fristik is sued in his official capacity.

## RUS FINANCING FOR COAL-FIRED POWER PLANTS

16.    RUS' Electric Program, one of many USDA "Rural Development" programs, is an artifact of President Roosevelt's depression-era campaign to assist impoverished farming communities by "electrifying" the West. While rural communities now generally have access to affordable electricity, RUS still has considerable funds at its disposal to spend in areas that, in many cases, are no longer rural. For example, RUS has awarded electric companies nearly $1 billion in low-interest loans to serve the booming suburbs of Atlanta, Georgia and Tampa,

Florida.  In this case, the Highwood coal plant would serve the city of Great Falls, as well as the suburbs of Billings, Montana.

17.    While RUS has long been a major funding source for electric cooperatives and larger power companies, interest in obtaining RUS funding for new coal plants has risen exponentially in recent years — a reflection of the ongoing industry rush to build new coal plants in advance of anticipated carbon regulation.  As a result, RUS is now in the midst of the financing process for at least seven new coal plants across the country.

18.    Each year, these plants would release millions of tons of greenhouse gases representing a significant percentage of total U.S. greenhouse gas emissions.  In addition, these plants would emit substantial quantities of mercury, very fine particulate matter smaller than 2.5 microns ("$PM_{2.5}$"), and other dangerous pollutants that can travel long distances, causing geographically widespread air pollution problems across the country.  Yet RUS has made no effort to assess the big picture environmental consequences of funding new coal plants.  Rather, RUS apparently takes the view that coal plant projects are welcome to available Rural Development funds on a first-come, first-serve basis, regardless of impacts on climate change, on regional air and water quality, and even on the rural agricultural resources that RUS was established to protect.

**The RUS Loan Program**

19.    Under the Rural Electrification Act of 1936 ("RE Act"), RUS is authorized to make loans for "rural electrification and for the purpose of furnishing and improving electric and telephone service in rural areas."  7 U.S.C. § 902(a).  As the RE Act's implementing regulations make clear, loan funding is available exclusively for projects that primarily benefit rural communities, so-called "RE Act beneficiaries."  See 7 C.F.R. § 1710.2 (defining "RE Act

beneficiary" to mean "a person, business, or other entity that is located in a rural area"). Loans

for facilities that serve non-RE Act beneficiaries, such as Great Falls residents, may be approved

<u>only</u> if: "(1) The primary purpose of the loan is to furnish and improve service for RE Act

beneficiaries <u>and</u>; (2) The use of loan funds to serve non-RE Act beneficiaries is necessary and

incidental to the primary purpose of the loan." <u>Id.</u> § 17.104(b) (emphasis added);

20.    Further, before RUS can finance any new generating facility such as a new coal-

fired power plant, the agency must confirm that there are no existing sources of power that can

provide equally affordable electricity. Thus, the loan regulations authorize RUS to make loans

for new generating facilities <u>only</u> "where the rates offered by other power sources would result in

a higher cost of power to the consumers," or "where no adequate and dependable source of

power is available to meet the consumers' needs." 7 C.F.R. § 1710.254(a). Thus, RUS

regulations effectively set up a presumption against funding new power plants — <u>i.e.</u>, new power

plants may be funded only where there is no alternative power source or available options would

be more expensive to customers than power from a new plant.

21.    This presumption is reflected in clear direction set forth in the President's 2008

proposed budget, which states the following:

> Since 1992, RUS electric loans have been used primarily to finance transmission,
> distribution and upgrades to generation facilities. During this time, generation has
> been deregulated and has become a more commercial operation. With the
> increased needs for all aspects of electricity provision, and to ensure adequate
> funding for rural areas, RUS loans will continue to focus on transmission,
> distribution, and upgrading generation facilities. <u>Construction of new generation</u>
> <u>facilities should be financed through the commercial market.</u>

<u>Budget of the United States Government, Fiscal Year 2008 - Appendix</u>, Department of

Agriculture, 146 (Feb. 2007) (emphasis added).

22.    Despite this announced policy to avoid funding new power plants, RUS is now on track to fund several new coal plants in addition to the Highwood plant.  These plants include a 600-MW pulverized coal plant in Missouri, a 385-MW plant in Wyoming, a 400-MW coal plant in Idaho, a 750-MW coal plant in Florida, a 750-MW coal plant in Oklahoma, and two 278-MW coal plants in Kentucky.  Individually and collectively, these federally financed projects will have enormous, long-lasting impacts on the environment.

### THE HIGHWOOD COAL PLANT'S ENVIRONMENTAL IMPACTS

23.    The environmental impacts of financing the Highwood coal plant are illustrative of impacts that RUS financing of coal plants threatens across the country.

### RUS' NEPA Analysis For The Highwood Plant

24.    On May 10, 2007, RUS issued a Record of Decision ("ROD") to "participate in funding" the Highwood plant, which is proposed by a group of eastern Montana electricity cooperatives known as the Southern Montana Electric Generation and Transmission Cooperative ("SME").  The ROD represents the culmination of the NEPA process, which began with initial scoping of issues in the fall of 2004.  Defendant Fristik announced the Release of a Draft Environmental Impact Statement ("EIS") in June 2006 and invited the public to send him comments.  In January 2007, Mr. Fristik announced the release of the Final EIS, and again invited comments.  While Plaintiffs provided Mr. Fristik with substantial new information regarding viable alternatives to building a polluting old-technology plant, RUS declined to revisit its cursory alternatives analysis.  Instead, the agency adopted SME's preferred alternative to build the Highwood coal plant virtually on top of a National Landmark.

25.    While final RUS loan approval is contingent on further financial analysis, RUS

has formally concluded its environmental review.  At this point in the financing process, RUS

will not condition loan approval on any further effort to avoid or mitigate environmental harm.

### The Highwood Coal Plant

26.    The 250-megawatt ("MW") Highwood plant would utilize a conventional

circulating fluidized bed ("CFB") boiler, which would require extremely expensive retro-fitting

in order to capture $CO_2$ emissions.  Other plant facilities would include a turbine building, smoke

stack, coal yard, high-voltage switchyard, cooling tower, water lines, transmission lines, a new

rail spur, access roads, and a sprawling landfill for disposal of coal ash and other solid waste

generated by the plant.  In addition, the facility would incorporate four wind turbines to generate

an additional 6 MW of power.  All of this new infrastructure would industrialize approximately

800 acres of prime agricultural land in Montana's fertile "Golden Triangle," 8 miles east of the

city of Great Falls.  This land is classified under county regulations as prime agricultural land of

statewide importance.

### Global Warming Impacts

27.    The Highwood coal plant would contribute to global warming, emitting 2.8 million

tons of greenhouse gases each year, including 2.1 million tons of $CO_2$ (nearly 1 ton of $CO_2$ per

megawatt hour ("MWH") of electricity generated) and the $CO_2$ equivalent of 67 million tons of

methane and nitrous oxide, which are even more potent greenhouse gases than $CO_2$.  The cumulative

impact of these emissions, in combination with emissions from other new coal-fired power plants,

will be very large.   For example, the Missouri coal plant for which the Associated Electric Coop.,

Inc. ("AEC") is seeking RUS funding, would emit an anticipated 6.8 million tons of $CO_2$ per year.

The Florida plant for which the Seminole Electric Cooperative is seeking RUS funding would emit

an estimated 5.7 million tons of $CO_2$ per year.  Together, the Highwood plant, the AEC plant, the

Seminole Electric plant, and at least five other foreseeable RUS-financed plants, could account for a

significant share of U.S. greenhouse gas emissions.  Yet RUS has never considered how financing

coal plants, along with other greenhouse gas emitting projects, contributes to climate change.

28.    As the Supreme Court has recently made clear, federal agencies can no longer

afford to ignore the monumental threats posed by climate change.  A National Research Council

Report, cited by the Court, has "identifie[d] a number of environmental changes that have

already inflicted significant harms, including the global retreat of mountain glaciers, reduction in

snow-cover extent, the earlier spring melting of rivers and lakes, and the accelerated rate of rise

of sea levels during the 20th century relative to the past few thousand years."  Massachusetts v.

EPA, 127 S. Ct. at 1455 (internal quotations, citations, and alterations omitted) (emphasis

added).  In future, the consequences of global warming promise to be even more severe.

According to Michael MacCracken, a climate scientist, also favorably cited by the Court,

"qualified scientific experts involved in climate change research have reached a strong consensus

that global warming threatens (among other things) a precipitate rise in sea levels by the end of

the century, severe and irreversible changes to natural ecosystems, a significant reduction in

water storage in winter snowpack in mountainous regions with direct and important economic

consequences, and an increase in the spread of disease."  Id. at 1456 (internal quotations and

citations omitted) (further noting MacCracken's "eerily prescient" observation that rising ocean

temperatures may contribute to the ferocity of hurricanes).

29.    Global warming is already resulting in many of these identified harms in

Montana.  As of 1997, precipitation had decreased by up to 20 percent in many parts of the state,

and over the last decade of drought, precipitation has declined much further.  "Over the next

11

century," RUS concedes that "Montana's climate may change even more."  FEIS, Vol. I at 3-46.

The consequences, as itemized by RUS, include: "glaciers melting and disappearing in Glacier

National Park and elsewhere in the Rocky Mountains; a potential decline in the northern Rockies

snowpack and stressed water supplies both for human use and coldwater fish; … an increase in

the frequency and intensity of wildfires as forest habitats dry out …; loss of wildlife habitat;

possible effects on human health from extreme heat waves and expanding diseases like Western

equine encephalitis, West Nile virus, and malaria; [and] possible impacts on the availability of

water for irrigated and dryland crop production alike."  Id.

### Regional Air Pollution

30.     In addition to global warming impacts, the Highwood coal plant threatens serious

harm to regional air quality.

31.     According to RUS estimates, the Highwood coal plant would emit thousands of

tons per year of  "criteria" pollutants regulated under the federal Clean Air Act's National

Ambient Air Quality Standards ("NAAQS"): 944 tons per year of Nitrogen Oxides ("NOx"), a

principal contributor to acid rain and formation of ground-level ozone and $PM_{2.5}$; 443 tons per

year of Sulfur Dioxide ("$SO_2$"), which in combination with NOx, causes acid rain and regional

haze; 1,117 tons per year of carbon monoxide, which exacerbates heart conditions and impairs

central nervous system function; and 366 tons per year of particulate matter smaller than 10

microns ("$PM_{10}$"), which causes serious heart and lung problems.

32.     Of particular concern, RUS assumes that all 366 tons of $PM_{10}$ to be emitted from

the Highwood coal plant will, in fact, be comprised of $PM_{2.5}$, the smallest and most dangerous

class of particulates or "soot" regulated under the NAAQS.  $PM_{2.5}$ consists of microscopic solid

or liquids particles that lodge deep into the human lungs.  Based on extensive peer-reviewed

research published over the past ten years, the U.S. Environmental Protection Agency ("EPA") has recognized that even short-term inhalation of $PM_{2.5}$ is linked with premature mortality, heart attacks, and respiratory diseases, including lung cancer and asthma.  In an effort to reduce $PM_{2.5}$-related hospital admissions and deaths each year, EPA has recently set more stringent NAAQS for $PM_{2.5}$, reducing the former 24-hour maximum standard by nearly half, from 65 micrograms per cubic meter ($\mu g/m^3$) to 35 $\mu g/m^3$.

33.    Direct emissions from the Highwood coal plant are expected to result in $PM_{2.5}$ concentrations of 33.3 $\mu g/m^3$, or 95% of the new 24-hour NAAQS.  While this dramatic increase in $PM_{2.5}$ pollution is, in itself, a cause for concern, actual concentrations of $PM_{2.5}$ will almost certainly be higher because RUS projections do not account for "secondary" $PM_{2.5}$ that is formed in the atmosphere by chemical reactions of gases such as NOx, which the plant will emit in large quantities.  Given that scientific research demonstrates that secondary emissions of $PM_{2.5}$ generally account for 50% of total $PM_{2.5}$ concentrations, construction and operation of the Highwood coal plant could result in $PM_{2.5}$ concentrations of more than 60 $\mu g/m^3$, nearly double the health-based NAAQS for $PM_{2.5}$.  Nevertheless, the Highwood coal plant would not be subject to any emissions limits or even monitoring requirements for $PM_{2.5}$.

34.    Further, the Highwood coal plant would emit hazardous air pollutants, including radionuclides such as radon, and toxic heavy metals, including an estimated 34.5 pounds of mercury each year through 2018, and nearly 22 pounds of mercury per year thereafter.  In Montana, mercury is already a serious problem.  The state has issued several health advisories based on mercury contamination in fisheries in many rivers, streams, and lakes, and the Montana Department of Fish Wildlife and Parks has recently reported mercury poisoning in bald eagles. As mercury moves up the food chain, it "biaccumulates," becoming increasingly concentrated.

Thus, even very low levels of mercury in a lake may translate into high mercury concentrations in fish. This in turn translates into high mercury blood levels in people and animals that consume the contaminated fish. In humans, mercury causes serious developmental and neurological problems, especially in fetuses and young children. This is a particularly grave concern in Montana because a disproportionate number of people rely on wild-caught fish and game for food. This is especially true of Native Americans living downwind of the proposed Highwood coal plant. Thus, additional mercury pollution from the Highwood coal plant is a major public health issue.

35.    Finally, pollution from the Highwood coal plant threatens the integrity of premier public lands. Modeling completed by SME indicates that emissions from the plant will contribute to noticeable impairment of visibility in pristine federal Class I areas — Glacier National Park and the Bob Marshall, Gates of the Mountains, and Scapegoat Wilderness Areas in Montana.

**Water Pollution**

36.    The Highwood coal plant also threatens water. Against the backdrop of rising temperatures, prolonged drought, and increasing stress on scarce water resources, the Highwood coal plant would pump up to 3,500 gallons of water per minute out of the Missouri River, consuming 4 to 5 million gallons of water per day.

37.    At the same time, the plant would create a toxic waste stream that could easily contaminate the remaining supply of local ground and surface water. Every day, the Highwood coal plant would produce approximately 225 tons of solid waste, equating to four full rail cars of waste in the form of fly ash, bed ash, and sludge or "slurry" — left-overs from the coal-burning process. Nearly all of this waste would be dumped into on-site landfills lined only with soils

found on the premises.  These so-called "monofills" would sit on top of a major aquifer, the

Madison Aquifer, which feeds Giant Springs, one of the largest fresh water springs in the world,

and a critical source of water for agricultural, commercial, and public use.

38.     Solid waste from coal-fired power plants contains most of the mercury and other

toxic heavy metals such as arsenic, cadmium, chromium, and selenium that are originally present in

raw coal.  As a result, coal combustion waste is often highly toxic.  Nevertheless, coal combustion

waste is exempted from federal hazardous waste regulations, and it remains wholly unregulated

under state law in Montana.

39.     This regulatory gap poses a major threat to water quality.  As the National Academy

of Sciences cautioned in a 2006 report, "Contaminants derived from CCRs [coal combustion

residues] have the potential to enter drinking water supplies, surface water bodies, or biota at

unacceptable concentrations …, thereby creating risks to human health and the environment."

National Research Council of the National Academies, Managing Coal Combustion Residue In

Mines, 59 (2006).  In fact, "EPA has identified numerous cases of water contamination related to

CCR landfills and surface impoundments that, in many cases, have caused considerable

environmental damage."  Id. at 4.

40.     At the Highwood facility, inadequate disposal of coal combustion waste threatens the

sort of water contamination and environmental damage that has occurred at power plant sites across

the country.  Soils at the Highwood plant site would be used to form "clay liners" and topsoil covers

for several landfills or "monofills."  Yet this soil is classified by the U.S. Department of Agriculture

("USDA") as "very limited" for many industrial uses, including use for clay liner material and for

cover of landfills.  Under the USDA's rating system, "very limited" means "that the soil has one or

more features that are unfavorable for the specified use. The limitations generally cannot be

overcome without major soil reclamation, special design, or expensive installation procedures.  Poor performance and high maintenance can be expected." USDA, Natural Resources Conservation Service, National Cooperative Soil Survey, Material Source Ratings For Cascade County Area, Montana (March 2007) (emphasis added).  At the Highwood plant, "poor performance" of on-site soils entails leakage, or "leaching," of toxic heavy metals into the groundwater aquifer and/or toxic runoff into surface water, including the Missouri River, which runs nearly adjacent to the project site.  Nevertheless, the Highwood coal plant would be exempt from any liner or groundwater monitoring requirements based on a preliminary ground-water demonstration that has never been made available to the public.

**Loss of Historic Landmark Status**

41.     In addition to polluting air and water in Montana, the Highwood coal plant would destroy a rare piece of history.  Under the current proposal, the coal plant would be built at the edge of the Great Falls Portage National Historic Landmark, with four wind turbines located inside the landmark boundaries.

42.     The Portage National Historic Landmark commemorates the arduous overland trek that the Lewis and Clark Expedition's Corps of Discovery made around the Great Falls of the Missouri River in 1805.  The Landmark's primary feature is a campsite where the party stayed for nearly a month, and where Sacagawea, Lewis and Clark's Native American guide, recovered from a life-threatening fever.  From here, it is still possible to look up and down the Missouri River as it flows undisturbed through a channel of high bluffs.  Looking eastward, back toward the site of the proposed coal plant, there is still an unobstructed view of high plains that eventually run into the Highwood Mountains.  As described by the National Park Service, which is charged with managing the Landmark, "[t]he unspoiled quality of the setting indicates a purity of place similar to that

experienced by the Expedition.  The lack of manmade intrusions is both visible and audible, defined by the natural soundscape, clear air, and an unimpeded night sky." Secretary Of The Interior's Report To The Advisory Council On Historic Preservation In Accordance With Section 213 Of The National Historic Preservation Act: Evaluation of the Proposed Highwood Generating Station on the Great Falls Portage National Historic Landmark, 8 (2007) ("Park Service Report").  For all of these reasons, the Park Service regards the site as "one of very few segments of the [Lewis and Clark National Historic Trail] that retains a high degree of natural and cultural integrity relatively free of modern human developments and intrusive activities." Id. at 9.

43.    Construction of the Highwood coal plant facilities would unavoidably destroy the Portage Landmark's integrity.  As explained by the Park Service, "[t]he integrity of the NHL [National Historic Landmark] is based mainly on its current condition of large, open, historic and natural landscapes relatively free of intrusions.  The proposed HGS [Highwood Generating Station] and ancillary features would constitute a broad and wide-scale impact on the surrounding landscape. …  This industrial scale development would introduce modern design into the NHL and the site's view shed, radically changing features that are vital to the character of the place." Id. at 9.

44.    For these reasons, the Park Service concluded in its official report to the Advisory Council on Historic Preservation that "the HGS would have widespread, profound, and adverse impacts on the NHL, and would require a critical review of its integrity; a process that would likely lead to the loss of NHL status for most, if not all, of the [portage] route." Id. at 2 (emphasis added). Ultimately, absent removal to a different site, construction of the Highwood coal plant will cause, in the Park Service's words, "an irreparable loss to the national heritage of our country." Id. at 9.

45.     Upon receipt of the Park Service's report, John Fowler, the executive director of the Advisory Council, promptly sent Defendant Andrew a letter strongly endorsing the Park Service's findings:

> The ACHP has reviewed the [Park Service] report and feels that it provides an excellent review of the significance and integrity of the Great Falls Portage NHL. In the words of the … report itself, "no other site along the … Lewis and Clark National Historic Trail so aptly represents the extreme hardships of the Expedition while being so geographically accessible to the general visiting public."

Letter from John M. Fowler to James M. Andrew, 1 (June 29, 2007).  Based on the "inadequacy of proposed treatment measures to avoid, minimize, or mitigate" harm to the Landmark, Mr. Fowler formally requested that RUS re-evaluate funding for the Highwood coal plant.  Id. at 2.

## NEED FOR THE HIGHWOOD COAL PLANT

46.     All of the environmental harms that flow from construction of the Highwood coal plant are avoidable.  Fundamentally, there is no need to build a new 250-MW coal-fired power plant at the Great Falls Portage National Historic Landmark, or anywhere else, to satisfy the limited demands of SME's customer base in sparsely populated eastern Montana.

47.     SME seeks federal funding to acquire an 85% interest in the Highwood coal plant, which translates into an 85% share of electricity generated by the proposed coal plant — roughly 212.5 MW of power.  According to SME, the expiration of contracts for electricity from the Bonneville Power Administration ("BPA") will leave its member cooperatives in urgent need of electricity that can only be supplied reliably and affordably by a new SME-owned coal plant. However, SME's asserted need to build a coal plant is premised on inflated projections of customer demand and under-estimates of capital and operating costs.  When actual demand and true costs are taken into account, it becomes apparent that building the Highwood coal plant is an exceedingly expensive way to generate far more energy than SME will ever use.

18

48.    From the outset, SME has greatly exaggerated its energy needs.  SME has 24,785 customers, or cooperative members, with a total of 33,935 meters.  Data from the Department of Energy ("DOE") reveals that the combined load demand of all of SME's member cooperatives is 53.9 average megawatts (aMW).  Since SME is already guaranteed to receive 20 aMW from the Western Area Power Administration ("WAPA"), it currently faces a shortfall of approximately 33.9 aMW when its BPA contracts expire in 2008-2011.  An 85% share in the Highwood coal plant would make up this shortfall six times over.

49.    Even during rare periods of highest peak demand, the Highwood coal plant would generate far more power than SME could possibly use.  DOE reports that the combined annual peak usage of all of SME's member cooperatives totals 124 MW.  In reality, peak energy usage by individual co-ops does not occur simultaneously, so it is highly unlikely that SME would ever need to supply 124 MW at one given time.  However, even in the extremely unusual worst-case scenario, SME's interest in the Highwood coal plant would provide 88 MW of surplus power.  Perhaps for this reason, SME has already negotiated to sell a firm 65 MW (fully 26% of the plant's total output) to an off-system Idaho purchaser, and this is only a small portion of the electricity that SME intends to sell on the wholesale power market.

50.    Nevertheless, SME insists that its customer base will grow and that eventually, its cooperative members will use their full share of electricity from the plant.  However, SME's projections of future demand are based on the wholly unsupported assumption that growth rates in rural, eastern Montana service areas will substantially exceed growth rates projected by the U.S. Census Bureau.

51.    In sum, U.S. government data from both DOE and the Census Bureau confirm that SME's energy needs are quite modest and will likely remain so into the foreseeable future.

Nevertheless, RUS has accepted SME's stated need for 212 MW of power without question.  This failure to undertake an independent evaluation of SME's legitimate energy needs has fundamentally skewed and corrupted the analysis of less environmentally harmful alternatives to building the Highwood coal plant.

## FAILURE TO CONSIDER ALTERNATIVE SOLUTIONS

52.    Having accepted SME's inflated projections of consumer demand, RUS has also accepted SME's contention that the only way to ensure a reliable, affordable supply of electricity is to build a 250-MW CFB coal plant.  Based on this assumption, RUS summarily dismissed environmentally preferred alternatives to meet SME's genuine energy needs.

53.    Specifically, RUS declined to give any meaningful consideration to alternatives involving: wind power and other renewable energy sources; advanced fossil fuel technologies such as IGCC, which enables more efficient coal combustion, more effective and affordable control of $CO_2$ emissions, and a more manageable waste stream; power purchase agreements for electricity from existing generating facilities; and conservation measures that would significantly reduce energy consumption.  According to the agency, it would be impracticable and prohibitively expensive to generate the amount of power SME is seeking (187 MW at the time the FEIS issued, and 212 MW under the terms of the ROD) without building a CFB coal plant.  However, RUS never evaluated, based on available government data, whether alternatives could meet the much smaller energy needs that SME is actually facing in the foreseeable future.  For instance, RUS never considered whether wind, which is becoming increasingly available at low cost in Montana, could viably generate 40 or 50 MW for SME.

54.    Further, in dismissing alternatives as too expensive, RUS never undertook a fair cost comparison based on realistic assumptions about the cost of generating electricity at the Highwood

coal plant.  Instead, RUS relied on SME's capital and operating cost projections.  However, SME's

own estimate of capital costs for the Highwood coal plant has recently risen from $470 million in

2004, to $515 million in 2005, to $678 million in 2006, and this estimate is still too low.  An

independent financial assessment commissioned by the City of Great Falls, which proposes to

finance 15% of the plant, cautioned that capital costs are more likely to be in the neighborhood of

$720 million.  Moreover, the assessment reported that: 1) SME has assumed an unrealistic operating

capacity in the first two years of operation; 2) SME's fuel cost assumptions should be adjusted

upward from $8.50 per ton of coal to $12 per ton — a 41% increase; and 3) SME's estimated

operating costs should be adjusted upward from $5.23 to $9.86 per megawatt hour ("MWH") — an

89% increase.  Based on these revised cost assumptions, along with other factors such as the

potential for monopoly pricing on rail service, the forecasted price of undelivered Highwood

electricity rises from $45.12 per MWH to $57.90 per MWH or higher by the year 2020.

55.    Because the recent independent analysis did not attempt to account for the cost of

future carbon regulation, the price of electricity from the Highwood coal plant would likely

exceed its estimate of $57.90 per MWH.  Based on recent studies and cost forecasts, carbon

regulation could potentially add over $64 million to the Highwood coal plant's annual operating

expenses.

56.    SME has stated publicly that it would seek to retrofit the new plant to allow for

carbon capture and sequestration if and when the appropriate technology becomes available.

However, even if SME were able to effectively control its carbon emissions, this retrofit would

come at major expense that would be passed on to SME customers.

57.    When the true costs of building and operating the proposed Highwood coal plant

are acknowledged, the price of electricity from alternative energy sources is more than

competitive with the price of electricity from the Highwood coal plant. A particularly

compelling example is wind. In a February 2007 report prepared for the Montana Public Service

Commission, the state's default energy supplier NorthWestern Energy disclosed that the final

cost of electricity generated by the Judith Gap Wind Farm Project in central Montana was $41.99

per megawatt-hour during its very first year of operation, and this rate includes so-called

"firming" costs to ensure a balanced electrical system even when the wind is not blowing. Thus,

there is already a wind farm operating in Montana that is successfully providing electricity on a

large scale at much cheaper rates than SME can promise. Moreover, the Judith Gap Wind farm

has announced that approximately 50 MW of new power will be coming on line in 2008 and will

be available for purchase at a cost of $31 per MWH, with additional firming costs running

between $10 and $15 per MWH. In short, there is available wind power to meet SME's energy

needs at significantly lower cost than the estimated cost of power from the proposed Highwood

coal plant.

     58.    Notwithstanding significant new information indicating that the Highwood coal

plant will cost much more than anticipated, and that alternative energy solutions would cost

much less than anticipated, RUS has declined to revisit its environmental analysis to consider

alternatives. The ROD issued on May 10, 2007 represents the agency's final determination to

reject alternatives and select an old-technology CFB coal plant for funding.

## FAILURE TO CONSIDER ALTERNATIVE SITES

     59.    The ROD also represents a final decision to site the Highwood coal plant virtually on

top of the Great Falls Portage National Historic Landmark. Building the coal plant at this location

will necessarily destroy the Landmark. Yet RUS has never undertaken its own independent

investigation to determine whether it is feasible to locate the plant at a different site.

60.    Rather, RUS effectively foreclosed meaningful consideration of alternative sites very early in the project planning process. During the initial "scoping" phase, RUS issued a misleading notice that failed to disclose any potential threat to the Landmark.  Rather than identifying proposed site locations, the notice directed readers to a cursory "Site Selection Study" on the RUS website. That study misidentified the location of the currently proposed site, and explicitly "dropped" the current Landmark site as an alternative because "the project would be located on property of significant historical activity — the beginning of the trail for the portage route taken by Lewis and Clark." Site Selection Study, 2-1 (Oct. 2004).  Thus, RUS misled the public, the Advisory Council, the State Historic Preservation Office ("SHPO"), and the National Park Service into believing the Landmark was not in any danger.

61.    It was not until mid-2006, when the Draft Environmental Impact Statement ("DEIS") was poised to issue, that RUS finally alerted the Council to the preferred alternative site's actual location.  At this point in the process, RUS had already narrowed the siting alternatives down to the Landmark site and the nearby "Industrial" site, which was already viewed by SME and the agency as a non-starter.  In effect, at the Draft EIS stage, the decision to site the Highwood Plant at the Landmark site had been made, and the decision has never been revisited.

62.    RUS never undertook its own investigation of available sites.  Instead, it relied on SME's cursory report identifying and rejecting all but the Landmark and Industrial sites.  By the time the NHPA consultation process was finally initiated,  As Defendant Fristik made clear that "the site selection process" was "off the table."  Meeting Notes, U.S. Department of Agriculture, Rural Utilities Service, Southern Montana Electric Generation and Transmission Cooperative, Inc., Proposed Highwood Generating Station NHPA S. 106 Consulting Parties Meeting (Mar. 7, 2007).

## RUS' DUTIES UNDER NEPA AND THE NHPA

63.    Failure to consider alternatives that would avoid harm to natural and historic resources violates the requirements of NEPA and the NHPA.

### NEPA's Requirements

64.    NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  As such, NEPA requires federal agencies to consider environmental harms and the means of preventing them in an Environmental Impact Statement ("EIS") before approving "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "Major federal actions" include projects such as the Highwood coal plant that are "entirely or partly financed … by federal agencies."  40 C.F.R. § 1508.18(a).

65.    In preparing an EIS, agencies must disclose the "environmental consequences" of a proposed agency action, including its direct, indirect, and cumulative impact.  See id. §§ 1502.16(a), (b), 1508.8.  As defined by regulation, cumulative impact means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." Id. § 1508.7.

66.    Further, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action.  40 C.F.R. § 1502.14(a).  Consideration of alternatives is "the heart of the environmental impact statement," because it compels agencies to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id.

67.    To elicit this informed comparison of alternatives, NEPA's implementing

regulations specifically demand that an EIS consider: "[e]nergy requirements and conservation

potential of various alternatives and mitigation measures;…[n]atural or depletable resource

requirements and conservation potential of various mitigation measures;… [and] historic and

cultural resources."  Id. §§ 1502.16(e), (f), (g).  In addition, the EIS must "state how alternatives

considered in it and decisions based on it will or will not achieve the requirements of [NEPA]

and other environmental laws and policies," which, in this case, include the Clean Air Act and

the NHPA.  Id. § 1502.2(d).

68.    In the event circumstances change, or new information becomes available,

agencies must address any significant implications for the proposed action in a supplemental EIS

("SEIS").  NEPA's implementing regulations provide that agencies "[s]hall prepare supplements

to either draft or final environmental impact statements if: … [t]here are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

actions and its impacts."  Id. § 1502.9(c)(1)(ii).

### NHPA's Requirements

69.    Similar to NEPA, the NHPA seeks to ensure that federal agencies fully consider

the consequences of proposed actions in time to avoid damage to national historic and cultural

resources.  Thus, "prior to the approval of the expenditure of any Federal funds," the Act

requires that federal agencies "take into account the effect of the undertaking on any district, site,

building, structure, or object that is included in or eligible for inclusion in the National Register."

16 U.S.C. § 470f.

70.    Where, as here, a federally funded project will "directly and adversely affect" a

National Historic Landmark, "the head of the responsible federal agency shall to the maximum

extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." Id. § 470h-2(f) (emphasis added). In keeping with this mandate, the NHPA's implementing regulations establish a consultation process in which the Advisory Council, the appropriate State Historic Preservation Office ("SHPO"), and other interested stakeholders help identify and evaluate impacts to the affected historic property, see 36 C.F.R. §§ 800.3-6, and "seek ways to avoid, minimize or mitigate the adverse effects." Id. § 800.6(b).

71.    Importantly, agencies must initiate consultation early in the project planning process "so that a broad range of alternatives may be considered." 36 C.F.R. § 800.3(c). While agencies may "[c]onduct[] or authoriz[e] nondestructive project planning activities before completing [the consultation process]," these activities must not "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." Id.

## FIRST CAUSE OF ACTION

### Violation of NEPA
(Failure To Assess Cumulative Impacts On Global Warming)

72.    Plaintiffs reallege and incorporate paragraphs 1 through 69.

73.    RUS neglected to consider the cumulative impact of greenhouse gas emissions from the Highwood coal plant in combination with emissions from other coal plants, including seven other coal plants that are currently seeking RUS financing.

74.    NEPA requires RUS to consider "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; see also

id. § 1502.16(b). As NEPA's implementing regulations expressly state, "[c]cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. § 1508.7.

75.    Financing the Highwood coal plant in combination with at least seven additional coal plants that will annually emit millions of tons of carbon dioxide and other greenhouse gases has a collectively significant impact on global warming. The EIS' failure to address this critically important issue is arbitrary, capricious, an abuse of discretion and contrary to NEPA and its implementing regulations. See id.; 5 U.S.C § 706(2)(A).

**SECOND CAUSE OF ACTION**

**Violation of NEPA**
(Arbitrary Definition of Purpose and Need)

76.    Plaintiffs hereby reallege and incorporate paragraphs 1 through 73 above.

77.    RUS violated NEPA in allowing SME to define "purpose and need" for federal financing without regard to its member cooperatives' true energy needs.

78.    In preparing an EIS, the agency must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Accordingly, the range of alternatives considered in the EIS flows from the agency's statement of purpose and need. If the purpose and need are defined too narrowly, the agency's consideration of alternatives is artificially constrained, defeating NEPA's fundamental aim to identify workable alternatives in time to avoid environmental harm.

79.    For the Highwood coal plant EIS, RUS accepted SME's definition of purpose and need without independently evaluating SME's unjustified assertions regarding consumer demand. Based on the arbitrary assumption that SME needs 187MW or more of electricity, RUS declined to consider alternatives that could satisfy a more modest energy demand, and in fact

27

issued a ROD that contemplates a 212.5 MW power supply for SME. Thus, from the outset of the NEPA process, the agency's definition of purpose and need improperly skewed the range of alternatives selected for consideration in the EIS. This violates NEPA and its implementing regulations. See id. §§ 1502.13, 1502.14. RUS' failure to state a legitimate purpose and need was arbitrary, capricious, an abuse of discretion, and contrary to law. See id.; 5 U.S.C. § 706(2)(A).

<strong>THIRD CAUSE OF ACTION</strong>

<strong>Violation of NEPA</strong><br>(Failure to Consider a Reasonable Range of Alternatives)

80.    Plaintiffs reallege and incorporate paragraphs 1 through 77.

81.    RUS violated NEPA in selecting the Highwood coal plant for funding without giving detailed consideration to any alternatives other than building a CFB coal plant.

82.    Under NEPA, RUS was required to "[r]igorously explore and objectively evaluate all reasonable alternatives," with explicit attention to their respective "[e]nergy requirements and conservation potential." 40 C.F.R. § 1502.14(a). Yet, aside from the "no action alternative," RUS considered only one alternative: locating the same CFB coal plant a few miles away from the currently proposed site. Thus, RUS summarily dismissed alternatives involving renewable energy including wind power, energy efficiency and conservation measures, advanced technologies such as IGCC, and power purchase agreements — all of which were suggested in comments submitted by Plaintiffs. This exclusive focus on conventional coal combustion foreclosed an informed choice between viable alternatives to meet SME's energy needs. RUS' failure to consider a reasonable range of alternatives was arbitrary, capricious, an abuse of discretion, and contrary to NEPA and its implementing regulations. See id.; 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION

### Violation of NEPA
(Supplemental EIS)

83.    Plaintiffs reallege and incorporate paragraphs 1 through 80.

84.    RUS violated NEPA in failing to supplement its alternatives analysis in light of significant new information that became available after the FEIS issued.

85.    RUS has accepted SME's contention that there are no economically viable alternatives to building a CFB coal plant, and it has therefore declined to give detailed consideration to wind power, advanced technologies such as IGCC, and purchase agreements for power from existing sources.  However, new information indicates that electricity from the Highwood coal plant would be far more expensive than assumed in the FEIS and that alternative sources of energy are likely to be more affordable than anticipated.  First, an independent financial assessment revealed that SME underestimated its capital and operating costs, and that its electricity rates will be substantially higher than anticipated.  Second, the release of new studies and forecasts has made it possible to project cost increases due to future carbon regulation.  Third, recent reports confirm that wind power is being generated on a large scale both reliably and affordably in Montana.  In light of this new information, RUS must revisit its assumptions regarding the relative costs of alternatives, taking into account a realistic estimate of the cost of electricity from the Highwood coal plant.

86.    In addition, RUS has received a new report from the Department of Interior indicating that the Great Falls Portage site will likely lose its National Historic Landmark status if the Highwood coal plant it built as currently proposed.  In light of this new information, RUS must revisit its analysis of alternative sites.

87.    Under NEPA, the RUS "<u>shall</u>" prepare supplemental analysis to address "significant new circumstances or information" that is relevant to an informed choice among alternatives.  40 C.F.R. § 1502.9(c)(1)(ii).  RUS' failure to supplement its analysis for the Highwood coal plant to account for significant new information bearing on the feasibility of alternatives is arbitrary, capricious, an abuse of discretion, and contrary to NEPA and its implementing regulations.  <u>See id</u>; 5 U.S.C. § 706(2)(A).

### FIFTH CAUSE OF ACTION

**Violation of NEPA**
(Failure To Assess Harms From Inadequate Solid Waste Disposal)

88.    Plaintiffs reallege and incorporate paragraphs 1 through 73.

89.    RUS violated NEPA in failing to take a hard look at a critically important aspect of the Highwood coal plant proposal: disposal of 225 tons of toxic coal combustion waste per day in unlined landfills.  The USDA's own data cautions that soils at the coal plant site are unsuitable for use in landfills.  Moreover, failure of unlined landfills at power plant sites across the country is well-documented.  As the National Academy of Sciences has made clear, mercury and other toxic heavy metals such as arsenic, cadmium, chromium, and selenium can, and do, leach out of coal plant landfills, contaminating ground and surface water.  Nevertheless, the EIS fails to mention that unsuitable soils may cause landfills at the Highwood coal plant to fail.  The EIS merely states that SME has completed a "No Migration Demonstration" (which has never been made available to the public), and that SME is therefore exempt from liner and groundwater monitoring requirements.

90.    The EIS' cursory treatment of a major public health issue provides no assurance that RUS has adequately considered the risks associated with dumping millions of tons of coal combustion waste into unlined landfills in an agricultural area near the banks of the Missouri

River.  In failing to provide any detailed analysis of potential water contamination and

alternatives to protect water quality — for example, installing liners, a leachate detection system,

and a groundwater monitoring system — RUS violated basic NEPA requirements to fully

disclose environmental impacts and identify mitigation measures.  See 40 C.F.R. §§ 1502.14(f),

1502.16.  RUS' failure to give meaningful consideration to toxic waste disposal was arbitrary,

capricious, an abuse of discretion, and contrary to NEPA and its implementing regulations.  See

id; 5 U.S.C. § 706(2)(A).

## SIXTH CAUSE OF ACTION

### Violation of NEPA
(Failure To Assess Compliance With Health-Based Clean Air Act Standards)

91.    Plaintiffs reallege and incorporate paragraphs 1 through 88.

92.    RUS violated NEPA in failing to assess whether pollution from the Highwood

coal plant will result in dangerous concentrations of $PM_{2.5}$.

93.    Under NEPA, an EIS must assess direct and indirect effects and disclose how

"alternatives considered in it and decisions based on it will or will not achieve the requirements

of [NEPA] and other environmental laws and policies" including the Clean Air Act's National

Ambient Air Quality Standards ("NAAQS").  40 C.F.R. § 1502.2(d); see also id. § 1502.16(b).

Because the NAAQS are designed specifically to protect human health and safety, it is vital to

consider whether the emissions from a project, taking into account its direct and indirect effects,

will achieve the NAAQS.

94.    The EIS for the Highwood coal plant estimates that direct emissions from the

Highwood coal plant will result in $PM_{2.5}$ concentrations of 33.3 $\mu g/m^3$, or 95% of the 24-hour

NAAQS of 35 $\mu g/m^3$.  When these emissions are combined with secondary $PM_{2.5}$ emissions from

the Highwood coal plant, $PM_{2.5}$ concentrations could be more than double the NAAQS — and

this does not account for other foreseeable development that will further increase $PM_{2.5}$

concentrations.  From the standpoint of public health, this is an issue of major concern.  Yet RUS

neglected to make any mention of it.  RUS' failure to assess $PM_{2.5}$ concentrations and disclose

potential NAAQS violations was arbitrary, capricious, an abuse of discretion and contrary to

NEPA and its implementing regulations.  See id.; 5 U.S.C § 706(2)(A).

### SEVENTH CAUSE OF ACTION

**Violation of the NHPA**
(Failure to Comply With NHPA Consultation Requirements)

95.     Plaintiffs reallege and incorporate paragraphs 1 through 92.

96.     RUS violated the NHPA in failing to ensure meaningful consideration of

alternatives that would avoid siting the Highwood coal plant at the Great Falls Portage National

Historic Landmark.

97.     Under the NHPA, a federal agency "shall to the maximum extent possible,

undertake such planning and actions as may be necessary to minimize harm to such landmark,

and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to

comment on the undertaking."  16 U.S.C. § 470h-2(f) (emphasis added).  To this end, the

NHPA's implementing regulations require the agency to initiate consultation early in the

planning process, while it still retains the maximum range of options to avoid harm to historic

properties.  36 C.F.R. § 800.3(c).

98.     Here, RUS failed to involve consulting parties — the Montana SHPO, the

Advisory Council on Historic Preservation, and the National Park Service — until after the

agency had eliminated all but one, allegedly unworkable alternative to the current Landmark site.

Based on the agency's representations early in the process, consulting parties and the public were

under the misimpression that the current site had been rejected in order to protect the Landmark. By the time they were informed otherwise, the Draft EIS analysis had already been completed, and RUS made no further attempt to identify other sites away from the Landmark.

99.    In excluding consulting parties from the early stages of the planning process, RUS foreclosed any opportunity for them to participate in key siting decisions.  This defies not only the timing requirements for NHPA consultation under 36 C.F.R. § 800.3(c), but also the overarching mandate under 16 U.S.C. § 470h-2(f) to "minimize harm" to Landmarks through thoughtful planning in cooperation with the Advisory Council.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs request that this Court:

1.    Declare that RUS violated NEPA and its implementing regulations in failing to consider the Highwood coal plant's cumulative impact on global warming;

2.    Declare that RUS violated NEPA and its implementing regulations in failing to state a legitimate purpose and need for the Highwood coal plant project;

3.    Declare that RUS violated NEPA and its implementing regulations in failing to analyze a reasonable range of alternatives;

4.    Declare that RUS violated NEPA and its implementing regulations in failing to prepare a supplemental environmental analysis to address new information bearing on the feasibility of alternatives to the proposed coal plant;

5.    Declare that RUS violated NEPA and its implementing regulations in failing to (1) disclose the potential for water contamination from toxic coal combustion waste, and (2) consider mitigation measures and alternatives to protect water quality;

6.    Declare that RUS violated NEPA and its implementing regulations in failing to assess $PM_{2.5}$ concentrations and failing to disclose NAAQS violations that are likely to follow construction of the Highwood coal plant;

7.    Declare that RUS violated the NHPA and its implementing regulations, in failing to prevent harm to the Great Falls Portage National Landmark through timely consultation;

8.    Invalidate the May 10, 2007 ROD;

9.    Issue an injunction prohibiting RUS from approving SME's loan application and disbursing funds pending compliance with NEPA and the NHPA;

10.    Award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

11.    Grant plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 20th day of July, 2007,

Douglas L. Honnold (D.C. Bar # 468323)
Abigail M. Dillen
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 596-9695
dhonnold@earthjustice.org
adillen@earthjustice.org

Stephen E. Roady (D.C. Bar # 926477)
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-667-4500 Telephone
Fax: 202-667-2356
sroady@earthjustice.org

*Counsel for Appellants*

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Montana Environmental Information Center<br>Citizens For Clean Energy<br>Sierra Club | James M. Andrew, in his official capacity as Administrator of the Rural Utilities Service, Mike Johanns, in his official capacity as Secretary of Agriculture |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Lewis and Clark<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____<br>(IN U.S. PLAINTIFF CASES ONLY) _____<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Douglas L. Honnold<br>Abigail M. Dillen<br>Earthjustice<br>209 South Willson Avenue<br>Bozeman, MT 59715<br>(406) 586-7217    Stephen E. Roady<br>D.C. Bar. No. 926477<br>Earthjustice<br>1625 Massachusetts Avenue, N.W.<br>Washington, D.C. 20036<br>(202) 667-4500 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ● C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>Social Security:<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>Other Statutes<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| Real Property | Bankruptcy | Forfeiture/Penalty | |
|---|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |
| Personal Property<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | Property Rights<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>Federal Tax Suits<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | Other Statutes<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Challenge to federal financing of coal-fired power plant based on inadequate environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  7/20/07    SIGNATURE OF ATTORNEY OF RECORD  *Doug Honnold*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.